NATURAL RESOURCES DEFENSE
COUNCIL, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Respondent,

Battery Council International, et
al., Respondents–Intervenors.

Nos. 90–70671, 91–70200.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 1991.

Decided June 4, 1992.

Robert W. Adler, Natural Resources Defense Council, Washington, D.C., for petitioner.

Daniel S. Goodman, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before PREGERSON, FERGUSON, and O'SCANNLAIN, Circuit Judges.

FERGUSON, Senior Circuit Judge:

The Natural Resources Defense Council ("NRDC") challenges aspects of the Environmental Protection Agency's ("EPA") recent Clean Water Act storm water discharge rule.[1] NRDC argues that the deadlines contained in the rule and the scope of its coverage are unlawful under section 402(*l*), (p) of the Clean Water Act, 33 U.S.C. § 1342(*l*), (p). We grant partial relief.

## I. BACKGROUND

In 1972 Congress enacted significant amendments to the Clean Water Act ("CWA"),[2] 33 U.S.C. §§ 1251–1387 (1988), "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One major focus of the CWA is the control of "point source" pollution. A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The CWA also established the National Pollutant Discharge Elimination System ("NPDES"), requiring permits for any discharge of pollutants from a point source pursuant to section 402

of the CWA, 33 U.S.C. § 1342. The CWA empowers EPA or an authorized state to conduct an NPDES permitting program. 33 U.S.C. § 1342(a)–(b). Under the program, as long as the permit issued contains conditions that implement the requirements of the CWA, the EPA may issue a permit for discharge of any pollutant. 33 U.S.C. § 1342(a)(1).

This case involves runoff from diffuse sources that eventually passes through storm sewer systems and is thus subject to the NPDES permit program. *See* National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges; Application Deadlines, 56 Fed.Reg. 56,548 (1991). One recent study concluded that pollution from such sources, including runoff from urban areas, construction sites, and agricultural land, is now a leading cause of water quality impairment. 55 Fed.Reg. at 47,991.[3]

A. Efforts to Regulate Storm Water Discharge.

Following the enactment of the CWA amendments in 1972, EPA promulgated NPDES permit regulations exempting a number of classes of point sources, including uncontaminated storm water discharge, on the basis of "administrative infeasibility," i.e., the extraordinary administrative burden imposed on EPA should it have to issue permits for possibly millions of point sources of runoff. *Natural Resources Defense Council v. Costle,* 568 F.2d 1369, 1372 & n. 5, 1377 (D.C.Cir.1977). NRDC

**1.** National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed.Reg. 47,990 (1990) (to be codified at 40 C.F.R. § 122.26); National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges; Application Deadline for Group Applications, 56 Fed.Reg. 12,098 (1991) (to be codified at 40 C.F.R. § 122.26(e)).

**2.** The Act is popularly known as the Clean Water Act or the Federal Water Pollution Control Act. 33 U.S.C. § 1251. For more background on the CWA, see *EPA v. State Water Resources Control Bd.,* 426 U.S. 200, 202–09, 96 S.Ct. 2022, 2023–26, 48 L.Ed.2d 578 (1976); *Sierra Club v. Union Oil of California,* 813 F.2d 1480, 1483 (9th Cir.1987), *vacated on other grounds,* 485 U.S.

931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988); and *Natural Resources Defense Council v. Train,* 510 F.2d 692, 695–97 (D.C. Cir.1975).

**3.** The Nationwide Urban Runoff Program (NURP) conducted from 1978 through 1983 found that urban runoff from residential, commercial and industrial areas produces a quantity of suspended solids and chemical oxygen demand that is equal to or greater than that from secondary treatment sewage plants. 55 Fed.Reg. at 47,991. A significant number of samples tested exceeded water quality criteria for one or more pollutants. *Id.* at 47,992. Urban runoff is adversely affecting 39% to 59% of the harvest-limited shellfish beds in the waters off the East Coast, West Coast and in the Gulf of Mexico. 56 Fed.Reg. at 56,548.

challenged the exemptions. Relying on the language of the statute, its legislative history and precedent, the D.C. Circuit held that the EPA Administrator did not have the authority to create categorical exemptions from regulation. *Id.* at 1379. However, the court acknowledged the agency's discretion to shape permits in ways "not inconsistent with the clear terms of the Act." *Id.* at 1382.

Following this litigation, EPA promulgated regulations covering storm water discharges in 1979, 1980 and 1984. 56 Fed. Reg. 56,548. NRDC challenged various aspects of these rules both at the administrative level as well as in the courts.

Recognizing both the environmental threat posed by storm water runoff[4] and EPA's problems in implementing regulations,[5] Congress passed the Water Quality Act of 1987[6] containing amendments to the CWA ("the 1987 amendments"), portions of which set up a new scheme for regulation of storm water runoff. Section 402(p), as amended, established deadlines by which certain storm water dischargers must apply for permits, the EPA or states must act on permits and dischargers must implement their permits. *See* Appendix A. The Act also set up a moratorium on permitting requirements for most storm water discharges, which ends on October 1, 1992. There are five exceptions that are required to obtain permits before that date:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

(E) A discharge for which the Administrator or the State, ... determines that the storm water discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to the waters of the United States.

CWA § 402(p)(2); 33 U.S.C. § 1342(p)(2).

Section 402(p) also outlines an incremental or "phase-in" approach to issuance of storm water discharge permits. The purpose of this approach was to allow EPA and the states to focus their attention on the most serious problems first. 133 Cong. Rec. 991 (1987). Section 402(p) requires EPA to promulgate rules regulating permit application procedures in a staggered fashion.

Responding to the 1987 amendments requiring the EPA to issue permit application requirements for storm water discharges associated with industrial activities and large municipalities, the EPA issued final rules on November 16, 1990, almost two years after its deadline ("the November 1990 rule"). 55 Fed.Reg. at 47,990. EPA issued amended rules on March 21, 1991 ("the March 1991 rule"). 56 Fed.Reg. at 12,098. It is to portions of these rules that NRDC objects.

**B. Jurisdiction.**

We have jurisdiction pursuant to CWA § 509(b)(1), 33 U.S.C. § 1369(b)(1). Section 509(b)(1) describes six types of actions by the EPA administrator that are subject to review in the court of appeals. Although the parties do not specify the section upon which they rely, § 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F) allows the court to review

---

**4.** *See* 132 Cong. Rec. 32,381 (1986).

**5.** Senator Stafford, speaking in favor of the conference report for the Water Quality Act, noted that "EPA should have developed this program long ago. Unfortunately, it did not. The conference substitute provides a short grace period during which EPA and the States generally may not require permits for municipal separate storm sewers." 132 Cong. Rec. 32,381 (1986). Senator Chafee stated "[t]he Agency has been unable to move forward with a [storm water discharge control] program, because the current law did not give enough guidance to the Agency. This provision provides such guidance, and I expect EPA to move rapidly to implement this control program." 133 Cong. Rec. 1,264 (1987).

**6.** Pub.L. No. 100–4, 101 Stat. 7 (1987) (codified as amended in scattered sections of 33 U.S.C.).

the issuance or denial of a permit under CWA § 402, 33 U.S.C. § 1342. The court also has the power to review rules that regulate the underlying permit procedures. *NRDC v. EPA*, 656 F.2d 768, 775 (D.C.Cir. 1981); *cf. E.I. DuPont de Nemours & Co. v. Train*, 430 U.S. 112, 136, 97 S.Ct. 965, 979, 51 L.Ed.2d 204 (1977). NRDC filed timely petitions for review of the final rules at issue here pursuant to CWA § 509(b)(1), 33 U.S.C. 1369(b)(1).

## C. Standing.

Any "interested person" may seek review of designated actions of the EPA Administrator. 33 U.S.C. § 1369(b)(1). This court has held that the injury-in-fact rule for standing of *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972) covers the "interested person" language. *Trustees for Alaska v. EPA*, 749 F.2d 549, 554 (9th Cir.1984) (adopting the analysis in *Montgomery Environmental Coalition v. Costle*, 646 F.2d 568, 578 (D.C.Cir.1980)). A petitioner under *Sierra Club* must suffer adverse affects to her economic interests or "[a]esthetic and environmental well-being." *Sierra Club*, 405 U.S. at 734, 92 S.Ct. at 1366. Intervenors are various industry and trade groups subject to regulation under the rules at issue. NRDC claims, inter alia, that EPA has delayed unlawfully promulgation of storm water regulations and that its regulations, as published, inadequately control storm water contaminants. NRDC's allegations and the potential economic impact of the rules on the intervenors satisfy the broad standing requirement applicable here.

## II. DISCUSSION

### A. Standard of Review.

5 U.S.C. § 706(2)(A) (1988) authorizes the court to "set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Under this standard a court must find a "rational connection between the facts found and the choice made." *Si-*

erra Pacific Indus., 866 F.2d 1099, 1105 (9th Cir.1989) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). The court must decide whether the agency considered the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

On questions of statutory construction, courts must carry out the unambiguously expressed intent of Congress. If a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Congress may leave an explicit gap, thus delegating legislative authority to an agency subject to the arbitrary and capricious standard. *Id.* at 843–44, 104 S.Ct. at 2781–82. If legislative delegation is implicit, courts must defer to an agency's statutory interpretation as long as it is reasonable. *Id.* at 844, 104 S.Ct. at 2782. This is because an agency has technical expertise as well as the authority to reconcile conflicting policies. *See id.* Nevertheless, questions of congressional intent that can be answered with "traditional tools of statutory construction" are still firmly within the province of the courts. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).

### B. EPA's Extension of Statutory Deadlines.

#### 1. *Background.*

NRDC challenges EPA's extension of certain statutory deadlines in the November 1990 and March 1991 rules. The statutory scheme calls for EPA to consider permit applications from the most serious sources of pollutants first: industrial dischargers and large municipal separate storm sewer systems ("large systems").[7] The statute required EPA to establish reg-

---

**7.** Large municipal systems are those serving a population of 250,000 or more. § 402(p)(2)(C).

ulations for permit application requirements for these two groups by February 4, 1989; to receive applications for permits one year later, February 4, 1990; and to approve or deny the permits by February 4, 1991. Permittees may be given up to three years to comply with their permits. CWA § 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A). Medium sized municipal separate storm sewer systems ("medium systems") (those serving a population of 100,000 or more but less than 250,000) are on a similar schedule, except that the deadlines are two years later. CWA § 402(p)(4)(B), 33 U.S.C. § 1342(p)(4)(B). The temporary statutory exemption for all storm water sources expires on October 1, 1992. CWA § 402(p)(1), 33 U.S.C. § 1342(p)(1). EPA states that discharges from municipal separate storm sewer systems serving a population of under 100,000 are to be regulated after that date.

The EPA rules at issue changed the statutory deadlines as follows:

| Deadlines pursuant to CWA § 402(p)[8] | | | EPA Deadlines[9] |
|---|---|---|---|
| Discharge type | Deadline to issue rules | Deadline for application and approval of permits | Application deadlines |
| Industrial | 2/4/89 | 2/4/90–applications due 2/4/91–approval due | See below |
| Large municipal systems | 2/4/89 | 2/4/90–applications due 2/4/91–approval | Part 1– 11/18/91 Part 2– 11/16/92 |
| Medium municipal systems | 2/4/91 | 2/4/92–applications due 2/4/93–approval due | Part 1– 5/18/92 Part 2– 5/17/93 |

**EPA Application Deadlines for "Industrial Activity" Dischargers**

*Individual* *Group*

due 11/18/91 Part 1–9/30/91; Part 2–10/1/92

As the chart illustrates, EPA made other elaborations on the statutory scheme in addition to extending the deadlines. Medium and large municipal systems and industrial dischargers are now subject to a two-part application process. 55 Fed.Reg. at 48,072. The November 1990 rules allow industrial dischargers to apply for either individual or group permits. *Id.* at 48,066–

8. Since NRDC filed this action, Congress has passed certain legislation affecting some of the deadlines at issue. Congress ratified the date of September 30, 1991 for part 1 of group applications for industrial dischargers. *See* Dire Emergency Supplemental Appropriations Act of 1991, Pub.L. No. 102–27, § 307, 105 Stat. 130, 152 (1991).

Section 1068 of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA") clarifies the deadlines for storm water discharges associated with industrial activity from facilities owned or operated by a municipality. Pub.L. No. 102–240, § 1068, 105 Stat.1914, 2007 (1991). ISTEA deadlines are being reviewed in a separate case. Nothing in this opinion should be viewed as requiring EPA to comply with deadlines that have been altered or superseded by the ISTEA.

9. *See* 55 Fed.Reg. at 48,071–72 (to be codified at 40 C.F.R. § 122.26(e)); 56 Fed.Reg. at 12,100 (to be codified at 40 C.F.R. § 122.26(e)(2)(iii)). EPA changed certain of these deadlines after this case was submitted. These changes are the subject of a separate case.

The EPA rules at issue set no date for final approval or denial of applications from municipal or industrial dischargers, nor for compliance by these regulated entities. *See* 55 Fed. Reg. at 48,072.

67. The March 1991 rules further extended the deadline for part 1 of the group industrial discharger permits to September 30, 1991.[10] 56 Fed.Reg. at 12,098. A final rule published on April 2, 1992 extended the deadline for the part 2 group application for industrial dischargers from May 18, 1992 to October 1, 1992. 57 Fed.Reg. at 11,394. The EPA rules at issue contain neither deadlines for final EPA or state approval of permits nor deadlines for compliance with the permit terms.

Seeking to compel the EPA to conform to the statutory scheme, NRDC asks this court:

a) to declare unlawful EPA's failure to issue certain of the storm water permitting regulations by February 4, 1989 and EPA's extension of certain statutory deadlines;

b) to enjoin EPA from granting future extensions of the deadlines;

c) to compel EPA to include deadlines for permit approval or denial and permit compliance consistent with the statute; and

d) to compel EPA to require that medium and small municipal systems meet the same deadlines as large systems.

2. *Discussion.*

a. Request for Declaratory Relief.

NRDC asks the court to (1) declare unlawful EPA's failure to issue storm water permitting regulations by February 4, 1989; and (2) declare unlawful EPA's extension of deadlines for submission of permit applications by large and medium systems and individual industrial dischargers.

■ A request for declaratory relief in a challenge to an agency action is ripe for review if the action at issue is final and the questions involved are legal ones. *Public Util. Dist. No. 1 v. Bonneville Power Admin.,* 947 F.2d 386, 390 n. 1 (9th Cir.1991) (citations omitted), *cert. denied,* — U.S. —, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992). Here, the agency regulations are

final. *See* 55 Fed.Reg. at 47,990, 56 Fed. Reg. at 12,096. The question of whether the EPA is bound by the statutory scheme set by Congress is a legal one. The request for declaratory relief is therefore ripe for consideration by this court.

■ The granting of declaratory relief "rests in the sound discretion of the [ ] court exercised in the public interest." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Civil Procedure* § 2759, at 645 (1983). The guiding principles are whether a judgment will clarify and settle the legal relations at issue and whether it will afford relief from the uncertainty and controversy giving rise to the proceedings. *McGraw–Edison Co. v. Preformed Line Products Co.,* 362 F.2d 339, 342 (9th Cir.) (citing Borchard, *Declaratory Judgments* 299 (2d ed. 1941)), *cert. denied,* 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966). A court declaration delineates important rights and responsibilities and can be "a message not only to the parties but also to the public and has significant educational and lasting importance." *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1471 (9th Cir.1984). Because of the importance of the interests and the principles at stake, we grant declaratory relief.

■ EPA does not have the authority to ignore unambiguous deadlines set by Congress. *Delaney v. EPA,* 898 F.2d 687, 691 (9th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990). In arguing against injunctive relief, EPA points to cases recognizing factors indicating that equitable relief may be inappropriate. *See, e.g., In re Barr Laboratories, Inc.,* 930 F.2d 72, 74 (D.C.Cir.) (agency's choice of priorities is an important factor in considering whether to grant equitable relief), *cert. denied,* — U.S. —, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991); *Natural Resources Defense Council v. Train,* 510 F.2d 692, 712 (D.C.Cir.1975) (court may need to give

---

**10.** NRDC initially claimed that this extension was unlawful because it was granted without proper notice and comment. However, Congress approved this extended deadline in a supplemental appropriations bill. Dire Emergency Supplemental Appropriations Act of 1991, Pub.L. No. 102–27 § 307, 105 Stat. 130, 152 (1991). This Act moots the procedural and substantive challenge to this extended deadline.

agency some leeway due to budgetary commitments or technological problems); *Environmental Defense Fund v. Thomas*, 627 F.Supp. 566, 569–70 (D.D.C.1986) (EPA's good faith is a factor). None of these factors militates against an award of declaratory relief. They do not grant an executive agency the authority to bypass explicit congressional deadlines. The deadlines are not aspirational—Congress set them and expected compliance. *See* 132 Cong.Rec. 32,381–82 (remarks of Senator Stafford, commenting on EPA delay and the establishment of statutory deadlines as "outside dates.") This court must uphold adherence to the law, and cannot condone the failure of an executive agency to conform to express statutory requirements. For these reasons, we grant NRDC's request for declaratory relief. EPA's failure to abide by the statutory deadlines is unlawful.

### b. Request for Injunction.

NRDC asks the Court to enjoin the EPA from further extensions for permit applications from municipal and industrial dischargers. Injunctions are an extraordinary remedy issued at a court's discretion when there is a compelling need. 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2942, at 365, 368–69 (1973). We decline to enjoin the EPA on discretionary grounds.

▪ Injunctive relief could involve extraordinary supervision by this court. Injunctive relief may be inappropriate where it requires constant supervision. *Id.* at 376. At issue are deadlines for the three major categories of dischargers, each of which has a two-part application. The permitting process will go on for several years. While recognizing the importance of the interests involved, we nevertheless decline to engage in the active management of such a remedy.

▪ In this situation, we must operate on the assumption that an agency will follow the dictates of Congress and the court. As noted above, the EPA does not have the authority to predicate future rules or deadlines in disagreement with this opinion.

*See Allegheny General Hosp. v. NLRB*, 608 F.2d 965, 970 (3rd Cir.1979). We presume that the EPA will duly perform its statutory duties. *See Upholstered Furniture Action Council v. California Bureau of Home Furnishing*, 442 F.Supp. 565, 568 (E.D.Cal.1977) (three judge court). Because we decline to take on potentially extensive supervision of the EPA, Congress may need to find other ways to ensure compliance if the agency is recalcitrant.

### c. Deadlines for Permit Approval and Compliance.

NRDC requests that the court compel EPA to revise the rules to include deadlines for permit approval or denial and permit compliance consistent with the statute. Section 402(p)(4)(A) calls for the EPA to issue or deny permits for industrial and large municipalities by February 4, 1991, which is one year after the applications are submitted, and states that "[a]ny such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of the issuance of such permit." CWA § 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A). The statute sets out a similar schedule for medium municipalities, except that the deadlines are two years later. CWA § 402(p)(4)(B), 33 U.S.C. § 1342(p)(4)(B).

▪ The regulations promulgated by the EPA contain neither final approval deadlines nor compliance deadlines for industrial dischargers or medium and large municipalities. 55 Fed.Reg. at 48,072. By failing to regulate final approval and compliance, EPA has omitted a key component of the statutory scheme. To ensure adherence to the statutory time frame, especially in the face of deadlines already missed, the regulated community must be informed of these deadlines. EPA's failure to include these important deadlines is an arbitrary and capricious exercise of its responsibility to issue regulations pursuant to the statute.

We see no need for additional delay while supplemental regulations are issued. Given the extraordinary delays already encountered, EPA must avoid further delay.

The regulations should inform the regulated community of the statute's outside dates for compliance.[11] *See* CWA § 402(p)(4)(A)–(B), 33 U.S.C. § 1342(p)(4)(A)–(B).

### d. Timeline for Small and Medium Systems.

 The parties disagree on when small systems (those serving a population of less than 100,000) should be regulated. As noted above, the temporary statutory exemption for all storm water sources expires on October 1, 1992. The statute requires EPA to establish a comprehensive program to regulate point sources subject to the moratorium, such as small municipalities, by that date. CWA § 401(p)(1), (6), 33 U.S.C. § 1342(p)(1), (6).

Pointing to a perceived statutory gap, NRDC argues that small systems should be subject to the same permitting schedule applicable to medium systems, to assure that they are regulated when the permitting moratorium ends on October 1, 1992. However, the plain language of the statute prohibits this. Section 402(p)(1) forbids requiring a permit for entities not listed as exceptions (such as small municipalities) before October 1, 1992. Yet the deadline for part 1 of the application for medium systems is currently May 18, 1992. 55 Fed. Reg. at 48,072.

Even if NRDC is correct that EPA is not proceeding so that regulations will be in place on October 1, 1992, we cannot ignore the plain language of the statute by adopting NRDC's solution. The CWA does not require regulation of such systems prior to expiration of the moratorium. We therefore reject NRDC's proposal that small systems be put on the same schedule as medium ones.

 NRDC asks the court to put the medium systems on the same schedule as the large systems, in order to achieve closer compliance with the timeline set out in § 402(p)(4)(B). However, EPA's current schedule for medium systems, although delayed, is still within the statutory scheme in

its relation to the schedule for large systems. That is, Congress placed the medium systems on a staggered permitting schedule to start two years after the large systems and industrial users. The EPA schedule now has medium municipal system applications due six months after the applications for the large municipal systems. 55 Fed.Reg. at 48,072. For this reason, the current deadline for medium municipalities does not appear to be unreasonable despite the unlawful delay.

### C. Exclusion of Certain Sources from Regulation.

#### 1. *Definition of "Municipal Separate Storm Sewer System."*

Section 402(p) refers to "municipal separate storm sewer system[s] serving a population" of a specified size. CWA § 402(p)(2)(C), (D), 33 U.S.C. § 1342(p)(2)(C), (D). NRDC contends that EPA's definition of this term violates the plain language of the statute, fails to take into account the statutory definition of the word "municipality" and is arbitrary and capricious because the agency considered improper factors when it defined the term. All of this, according to NRDC, results in an impermissible narrowing of the municipalities covered by the first two rounds of permitting.

The 1987 amendments to the CWA did not contain definitions of "municipal" or "separate storm sewer system," but the CWA amendments enacted in 1972 defined "municipality" as follows:

> [e]xcept as otherwise specifically provided, when used in this chapter: .... (4) The term "municipality" means a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes, or an Indian tribe or an authorized Indian tribal organization, or a designated and ap-

---

**11.** In addition, pursuant to the statute, compliance deadlines applicable to each facility shall be contained in its permit.

proved management agency under section 1288 of this title [33 U.S.C. § 1288]. 33 U.S.C. § 1362.

In the November 1990 regulations, the EPA defined "municipal separate storm sewer" as: "a conveyance or system of conveyances ... [o]wned or operated by a State, city, town, borough, county, parish, district, association or other public body...." 55 Fed.Reg. at 48,065 (to be codified at 40 C.F.R. § 122.26(b)(8)). This definition echoes the language of 33 U.S.C. § 1362(4). However, when defining large and medium municipal separate storm sewer *systems serving a population* of a specified size, EPA brought in other factors. 55 Fed.Reg. at 48,064 (to be codified at 40 C.F.R. § 122.26(b)(4), (7)). EPA defines medium and large separate storm sewer systems using two main categories:

1) separate storm sewer systems located in an incorporated place with the requisite population, and

2) separate storm sewer systems located in unincorporated, urbanized portions of counties containing the requisite population (as listed in Appendices H and I to the rule), excluding those municipal separate sewers located in incorporated places, townships or towns within such counties.[12] 55 Fed.Reg. at 48,064. NRDC opposes this definition for municipal separate storm sewer systems for the reasons explained below.

First, NRDC argues that according to the definitional section cited above and principles of statutory construction, general definitions apply wherever the defined term appears elsewhere in the law. *See* 33 U.S.C. § 1362 ("[e]xcept as otherwise specifically provided" the definitions apply throughout the act); *Sierra Club v. Clark,* 755 F.2d 608, 613 (8th Cir.1985). NRDC argues that the scope of the statutory definition of "municipality" in 33 U.S.C.

§ 1362(4) and the scope of the phrase "municipal separate storm sewer system serving a population" are the same. NRDC thus proposes that the correct definition is a system of conveyances owned or operated by the full range of entities described at 33 U.S.C. § 1362(4), (cities, towns, etc.) with populations within the ranges designated at § 402(p)(2), i.e., 250,000 or more for large systems and between 100,000 and 250,000 for medium systems.

However, we do not believe that the entire phrase used in the act, "municipal separate storm sewer system serving a population of [a specified size]" can be equated with the term "municipality" in the manner that NRDC proposes. The act contains no definition of either "system" or "serving a population." The word "system" is particularly ambiguous in the context of storm sewers.[13] We therefore agree with EPA that there is no single, plain meaning for the disputed words.

Because the term is ambiguous, we must look first to whether Congress addressed the issue in another way. *See Abourezk v. Reagan,* 785 F.2d 1043, 1053 (D.C.Cir.1986) (" [i]f the court finds that Congress had a specific intent ..., the court stops there and enforces that intent regardless of the agency's interpretation") (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 2781 & n. 9, 81 L.Ed.2d 694 (1984)), *aff'd by an equally divided court,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987). The legislative history is not illuminating. Although it explains that a purpose of the permitting scheme was to attack the most serious sources of discharge first,[14] this general goal is not helpful in discerning the specific meaning of "municipal separate storm sewer system serving a population." Without clear guidance from Congress, we turn to the agency's justifica-

---

**12.** The rule also permits the Administrator to include certain other systems as part of a medium or large system due to the physical interconnections between the systems, their locations, or certain other factors. *See* 40 C.F.R. § 122.-26(b)(4)(iii), (iv) and (b)(7)(iii), (iv).

**13.** Storm sewers located within the boundaries of a city might be part of a state highway system, a flood control district, or a system operated by the state or county. *See* 55 Fed. Reg. at 48,041.

**14.** *See, e.g.,* 133 Cong. Rec. 991 (1987) (statement of Rep. Stangeland).

tions for its choices in the face of NRDC's objections.

NRDC claims that EPA's definition is arbitrary and capricious because EPA considered improper factors, including its own work load, the incorporation status of municipalities, and urban density. "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

EPA's final definition took into account many issues and concerns of the regulated community. *See* 55 Fed.Reg. at 48,039. EPA considered eight different options for defining large and medium municipal separate storm sewer systems. 55 Fed.Reg. at 48,038–43. EPA considered focusing on ownership or operation of a system by an incorporated place, but found that this approach did not take into account systems operated by flood control districts, state transportation systems, or concerns relating to watershed management. It instead fashioned a multi-faceted approach. This choice of approach is not unreasonable.

NRDC challenges EPA's consideration of incorporation as a factor. It claims that limiting regulation to incorporated places of the appropriate size excludes portions of 378 counties that contain over 100,000 people. NRDC essentially contends that because counties are a type of municipality, storm water conveyances in all counties with populations over 100,000 should come within the definition of either medium or large municipal separate storm sewer systems. We have already rejected NRDC's claim that the definition of regulated "systems" must include conveyances in all "municipalities."

EPA's use of incorporation as a factor is not arbitrary and capricious or inconsistent with the statute. The agency proceeded on the reasonable assumption that cities possess the police powers needed effectively to control land use within their borders. *See* 55 Fed.Reg. at 48,039, 48,043. The first major category within the definition of regulated "systems," municipal separate storm sewers located within incorporated places having the requisite population, is reasonable.

NRDC questions EPA's second major category, which covers storm sewers located in unincorporated urbanized areas of counties with the designated population, but excludes conveyances located in incorporated places with populations under 100,000 within those counties. The exclusion, however, has a legitimate statutory basis. The statute prohibits EPA from requiring permits for systems serving under 100,000 persons prior to October 1, 1992. CWA § 402(p)(1), 33 U.S.C. § 1342(p)(1). EPA reasonably concluded that conveyances within small incorporated places should be considered parts of small systems limited to those incorporated places, rather than parts of larger systems serving whole counties. EPA's definition attempts to capture population centers of over 100,000 (by including urbanized, unincorporated areas) without violating the congressional stricture against regulation of areas with populations under 100,000 (thus excluding incorporated areas of less than 100,000 within a county).

In arriving at its definition of "municipal separate storm sewer systems serving" a designated population, EPA investigated numerous options and considered comments from a range of viewpoints. We find "a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866.

NRDC objects to EPA's use of 1980 census data and EPA's definition of urban density. While it appears that NRDC has solid arguments as to why it would be preferable to use 1990 census figures and adopt its method of determining urban density, our role is not to determine whether EPA has chosen the best among all possi-

ble methods. We can only determine if its choices are rational. EPA chose the 1980 census data because it was the most widely available decennial census data at the time of rule formulation and promulgation. Neither this choice nor its use of the Census Bureau's definition of urbanized area is arbitrary and capricious.

EPA took agency work load into account in arriving at its definition. 55 Fed.Reg. at 48,039. NRDC objects on the basis that Congress considered the issue of work load when it developed the "phase-in" approach and allowed permit applications on a system- or jurisdiction-wide basis. However, this broad congressional scheme does not prohibit further consideration of EPA's work load as one among many factors in its attempt to fashion a workable program.

■ In summary, NRDC's argument that the phrase "municipal separate storm sewer system serving a population" has the plain meaning NRDC proposes is not persuasive. Although EPA's definition in the face of the statute's ambiguity is complex, if not convoluted, it is not arbitrary and capricious, and we therefore reject NRDC's request that the definition be declared invalid.

### 2. *EPA Exemption for Light Industry.*

■ NRDC challenges the portion of the EPA rule excluding various types of "light industry" from the definition of "discharge associated with industrial activity."

Under CWA § 402(p)(2)(B), a "discharge associated with industrial activity" is an exception to the permit moratorium. In the November rule, EPA modified the statutory scheme by drawing distinctions among light and heavy industry and considering actual exposure to industrial materials. Although the statute does not define "associated with industrial activity," the EPA definition excludes industries it considers more comparable to retail, commercial or service industries. The excluded categories are manufacturers of pharmaceuticals, paints, varnishes, lacquers, enamels, machinery, computers, electrical equipment, transportation equipment, glass products, fabrics, furniture, paper board,

food processors, printers, jewelry, toys and tobacco products. 55 Fed.Reg. at 48,008. These types of facilities need apply for permits only if certain work areas or actual materials are exposed to storm water. *Id.* EPA justifies these exemptions on the assumption that most of the activity at these types of manufacturers takes place indoors, and that emissions from stacks, use of unhoused manufacturing equipment, outside material storage or disposal, and generation of large amounts of dust and particles will all be minimal. 55 Fed.Reg. at 48,008.

Thus, EPA considers actual exposure to certain materials or stormwater for the light industry categories, but does not consider actual exposure for the other industrial categories. After careful review of the statutory language and the record, we conclude that this distinction is impermissible.

We note that the language "discharges associated with industrial activity" is very broad. The operative word is "associated." It is not necessary that storm water be contaminated or come into direct contact with pollutants; only association with any type of industrial activity is necessary.

There is a brief discussion of the issue in the legislative history: "[a] discharge is associated with industrial activity if it is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. Discharges which do not meet this definition include those discharges associated with parking lots and administrative and employee buildings." 133 Cong.Rec. 985 (1987); *see also* 132 Cong.Rec. 31,968 (1986) (same). EPA argues that the words "directly related" indicate Congress's intent to require permits for only those materials that come in contact with industrial materials. *See* 55 Fed. Reg. at 48,007. However, the examples given—parking lots and administrative buildings—indicate that the intent was to exclude only those facilities or parts of a facility that are completely non-industrial.

EPA's definition follows the language quoted above: "Storm water discharge associated with industrial activity means the

discharge from any conveyance which is used for collecting and conveying stormwater and which is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14). EPA applies this definition differently depending on type of industry. EPA bases its regulation of industrial activity on Standard Industrial Classification ("SIC") categories. For most of the industrial SIC categories (identified at 40 C.F.R. § 122.26(b)(i-x)), the EPA definition includes all stormwater discharges from plant yards, access roads and rail lines, material handling sites, storage and disposal sites, shipping and receiving areas, and manufacturing buildings. 40 C.F.R. § 122.26(b)(14). However, for the "light industry" categories identified in 40 C.F.R. § 122.26(b)(14)(xi), stormwater must be actually exposed to raw materials, by-products, waste, etc., before permitting is required.

EPA justifies this difference on the ground that for "light industry," industrial activity will take place indoors, and that generation of large amounts of particles and emissions will be minimal. There is nothing in the record submitted to the Court however, which supports this assumption. *See, e.g.*, 55 Fed.Reg. at 48,008. Without supportable facts, we are unable to rely on our usual assumption that the EPA has rationally exercised the duties delegated to it by Congress. To exempt these industries from the normal permitting process based on an unsubstantiated assumption about the this group of facilities is arbitrary and capricious.

In addition, by designating these light industries as a group that need only apply for permits if actual exposure occurs, EPA impermissibly alters the statutory scheme. The statute did set up a similar approach for oil, gas, and mining industries. However, no other classes of industrial activities are subject to the more lenient "actual exposure" test. To require actual exposure entirely shifts the burden in the permitting scheme. Most industrial facilities will have to apply for permits and show the EPA or state that they are in compliance. Light industries will be relieved from applying for permits unless actual exposure occurs. The permitting scheme then will work only if these facilities self-report, or the EPA searches out the sources and shows that exposure is occurring. We do not know the likelihood of either self-reporting or EPA inspection and monitoring of light industries, and the regulations appear to contemplate neither for these industries. For this reason, the proposed regulation is also arbitrary and capricious.

In conclusion, we hold that the rule for light industries is arbitrary and capricious, vacate the rule, and remand for further proceedings.

### 3. *Exclusion of Construction Sites of Less than Five Acres.*

NRDC challenges the exemption for construction sites of less than five acres. EPA concedes that the construction industry should be subject to storm water permitting because at a high level of intensity, construction is equivalent to other regulated industrial activities. 55 Fed.Reg. at 48,033. Construction sites can pollute with soil sediments, phosphorus, nitrogen, nutrients from fertilizers, pesticides, petroleum products, construction chemicals and solid wastes. *Id.* EPA states that such substances can be toxic to aquatic organisms, and affect water used for drinking and recreation. *Id.*

Following its characterization of construction sites as suitable for regulation, EPA defined its task as determining "an acreage limit [ ] appropriate for identifying sites that amount are (sic) to industrial activity." 55 Fed.Reg. at 48,036. EPA originally proposed regulations that exempted operations that disturb less than one acre of land and are not part of a common plan of development or sale. 55 Fed.Reg. at 48,035–36. In response to comments by the regulated community about the administrative burden presented by the regulation, EPA increased the exemption to five acres. 55 Fed.Reg. at 48,-036. EPA also noted that larger sites will involve heavier equipment for removing vegetation and bedrock than smaller sites. *Id.* at 48,036.

We find that EPA's rationale for increasing the limit from one to five acres inadequate and therefore arbitrary and capricious. EPA cites no information to support its perception that construction activities on less than five acres are non-industrial in nature.

■ EPA also claims agency power, inherent in statutory schemes, to make categorical exemptions when the result is *de minimis*. *Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C.Cir.1979). However, if construction activity is industrial in nature, and EPA concedes that it is, EPA is not free to create exemptions from permitting requirements for such activity. *See Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1377 (D.C.Cir. 1977) (once Congress has delineated an area that requires permits, EPA is not free to create exemptions).

Further, we find the *de minimis* principle inapplicable here. The *de minimis* exemption is only available where a regulation would "yield a gain of trivial or no value." *Alabama Power Co., supra*, at 361. Because of the lack of data, we cannot know whether exempting sites of less than five acres will indeed have only a *de minimis* effect.

The *de minimis* concept is based on the principle that the law does not concern itself with trifling matters. *Id.* at 360. We question its applicability in a situation such as this where the gains from application of the statute are being weighed against administrative burdens to the regulated community. *See id.* at 360–361 (implied authority to make cost-benefit decisions must derive from statute, and not general *de minimis* doctrine).

Further, EPA's claim that the five-acre exemption is *de minimis* is contradicted by the admission that even small construction sites can have a significant impact on local water quality. * The EPA acknowledges that "[o]ver a short period of time, construction sites can contribute more sediment to streams than was previously deposited over several decades." 55 Fed. Reg. at 48,033. Without data supporting the expanded exemption, we owe no deference to EPA's line-drawing. We thus hold that EPA's choice of a five-acre limit is arbitrary and capricious, invalidate that portion of the rule exempting construction sites of five acres or less from permitting requirements, and remand for further proceedings.

4. *Exemption for oil and gas activities.*

The 1987 amendments created an exemption from the permit requirement for uncontaminated runoff from mining, oil and gas facilities. *See* Appendix, CWA § 402(*l*)(2), 33 U.S.C. §§ 1342(*l*)(2). Section 402(*l*)(2) states that a permit is not required for discharges of storm water runoff from mining, oil or gas operations composed entirely of flows from conveyance systems used for collecting precipitation runoff and "which are not contaminated by contact with, or do not come into contact with any overburden, raw material, intermediate products, finished product, by-product, or waste products". NRDC claims that the November 1990 rule sets up an impermissible standard for determining contamination at oil and gas facilities. The relevant portion of the rule states that at these facilities, an operator is not required to submit a permit application unless the facility has had a discharge of a reportable quantity [15] since November 1987, or contributes to a violation of a water quality standard. 55 Fed.Reg. 48,067 (to be codified at 40 C.F.R. § 122.26(c)(1)(iii)). A facility which has had a release of oil or a hazardous substance in excess of RQs since

---

**15.** "Reportable Quantities" (RQs) are not effluent guidelines setting up permissible limits for pollutants. Rather, they are quantities the discharge of which "may be harmful to the public health or welfare of the United States." CWA § 311(b)(4), 33 U.S.C. § 1321(b)(4). EPA has established RQs for a large number of substances, pursuant to both CWA section 311, 33 U.S.C. § 1321, and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") section 102, 42 U.S.C. § 9602. *See* 40 C.F.R. Parts 110, 117, 302. The operator of any vessel or facility which releases the RQ of any substance must immediately notify the National Response Center. *See, e.g.,* 40 C.F.R. § 110.10.

1987 must submit a permit application. *Id.*; 55 Fed.Reg. at 48,029–30.

NRDC claims that oil and gas operations should be subject to the stricter standards which apply to mining operations.[16] It also objects to EPA's use of RQs as the only test for contamination of runoff from oil and gas storm water dischargers, claiming it is inconsistent with the legislative history. We conclude that the legislative history does not support NRDC's position.

The conference report states:

[P]ermits are not required where stormwater runoff is diverted around mining operations or oil and gas operations and does not come in contact with overburden, raw material, product, or process wastes. In addition, where stormwater runoff is not contaminated by contact with such materials, *as determined by the administrator*, permits are also not required. With respect to oil or grease or hazardous substances, the determination of whether stormwater is "contaminated by contact with" such materials, *as established by the Administrator*, shall take into consideration whether these materials are present in such stormwater runoff in excess of reportable quantities under section 311 of the Clean Water Act ..., or in the case of mining operations, above natural background levels.

H.R.Rep. No. 1004, 99th Cong., 2d Sess., at 151 (emphasis added).

■ Thus, the EPA Administrator has discretion to determine whether or not storm water runoff at an oil, gas or mining operation is contaminated with two types of materials: (1) overburden, raw material, product, or process wastes and (2) oil, grease or hazardous substances. The report sets out factors for the Administrator to consider in determining contamination for the latter group of pollutants.

NRDC first claims that because section 402(*l*)(2) treats oil, gas and mining together, the EPA rule must do the same. NRDC's second objection is based on its interpretation of the language in the con-

ference report. Because the conference report lists RQs as only one factor to be taken into consideration, NRDC insists EPA cannot make it the only factor to measure contamination for oil and gas facilities.

Both of these arguments must fail in light of the conference report, which gives the Administrator discretion to determine when contamination has occurred with respect to the substances listed in the statute, i.e., overburden, raw materials, waste products, etc. *See* CWA § 402(*l*)(2). The conference report states that the Administrator shall take certain factors into account, but the report is clear that the determination of whether storm water is contaminated is within the Administrator's discretion.

NRDC argues that the remarks of certain congressmen during congressional debate show that the mining, oil, and gas exemptions were to apply only if the discharges were entirely free of contaminants. We find these examples less persuasive than the clear language of the conference report. Moreover, in light of the discretion granted the Administrator in the conference report, we cannot say that the rule as promulgated is an arbitrary and capricious exercise of that discretion.

NRDC also contends that Congress intended that EPA consider reportable quantities only in determining if a discharge is contaminated with oil, grease, or hazardous substances. Other pollutants, according to NRDC, must be found to contaminate the discharge if they exceed background levels.

EPA did not, in fact, limit itself to reportable quantities in determining which oil or gas facilities must apply for a permit. The rule requires a permit for any facility which "[c]ontributes to a violation of a water quality standard." 40 C.F.R. § 122.-26(c)(1)(iii)(C). This requirement addresses contamination with substances other than oil and hazardous substances. We find no support in the statute or the legislative history for NRDC's claim that, with re-

---

16. Operators of mines must submit permit applications whenever storm water discharges come into contact with overburden, waste products, etc. 40 C.F.R. § 122.26(c)(1)(iv).

spect to these substances, levels above background must be considered "contamination." The conference report quoted above requires consideration of background levels of any pollutant only with respect to mining operations.

### D. Lack of Controls for Municipal Storm Water Discharge.

NRDC contends that EPA has failed to establish substantive controls for municipal storm water discharges as required by the 1987 amendments. Because Congress gave the administrator discretion to determine what controls are necessary, NRDC's argument fails.

Prior to 1987, municipal storm water dischargers were subject to the same substantive control requirements as industrial and other types of storm water. In the 1987 amendments, Congress retained the existing, stricter controls for industrial storm water dischargers but prescribed new controls for municipal storm water discharge. CWA § 402(p)(3)(A), (B), 33 U.S.C. § 1342(p)(3)(A)–(B). The Act states that permits for discharges from municipal storm sewers:

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-storm water discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, *and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.*

Section 402(p)(3)(B), 33 U.S.C. § 1342(p)(3)(B) (emphasis added).

NRDC charges that the EPA regulations accomplish neither of the goals above, i.e., they do not effectively prohibit non-storm water discharges nor do they require the controls described in ¶ (iii), above. NRDC argues that Congress granted the moratorium precisely to give EPA the opportunity to develop new, substantive standards for storm water control of municipal sources and instead EPA wrote vague regulations containing no minimum criteria or performance standards.[17] However, the language in ¶ (iii), above, requires the Administrator or a state to design controls. Congress did not mandate a minimum standards approach or specify that EPA develop minimal performance requirements. NRDC also claims that the testing requirements are inadequate because there is only limited sampling at a limited number of sites. However, we must defer to EPA on matters such as this, where EPA has supplied a reasoned explanation of its choices. *See* 55 Fed.Reg. at 48,049.

NRDC's argument that the EPA rule is inadequate cannot prevail in the face of the clear statutory language and our standard of review. Congress could have written a statute requiring stricter standards, and it did not. We therefore reject NRDC's argument that EPA's storm water control regulations fail to comply with the statute.[18]

### E. Lack of Notice and Comment on the Approval of Part 1 of Industrial Group Storm Water Applications.

NRDC objects to the lack of opportunity for notice and comment before EPA approval of part 1 of group applications for industrial dischargers. Each member of a proposed group must submit part 1 of the application.[19] If EPA approves part 1, only

---

**17.** The requirements for permit applications are set forth at 40 C.F.R. § 122.26(d). Individual NPDES permit writers (EPA or state officials) will decide whether application proposals are adequate. Applicants must submit information on source control methods and estimate the annual pollutant load reduction to be achieved from their proposed management programs, but they are not required to achieve any specified level of reduction of any pollutants. *See* 55 Fed.Reg. at 48,070–71.

**18.** We base our holding on NRDC's challenge to the regulations at issue. Whether a specific permit complies with the requirements of section 402(p)(3)(B) would, of course, be another matter not controlled by this decision.

**19.** Part I must include the identity of the group's participants, a description of the participants' industrial activities, a list of significant materials exposed to precipitation and the identity of the subset of the group's members who will

a small subset of the member facilities need submit part 2 of the application. 55 Fed.Reg. at 48,072 (to be codified at 40 C.F.R. 122.26(e)(2)). NRDC claims that because approval of part 1 waives the requirement of filing part 2 for most members of a group, EPA's decision on part 1 is equivalent to a "rule" requiring notice and comment from the public. The issue thus presented is whether EPA's decision on a part 1 group permit application is a "rule" as defined in 5 U.S.C. § 551(4) (1988)[20] requiring public notice and opportunity to comment under 5 U.S.C. § 553 (1988), or is otherwise subject to the notice and comment requirement.

■ NRDC argues that approval or disapproval of a part 1 application requires public comment because it has "general applicability" pursuant to 5 U.S.C. § 551(4) and because it will have a "palpable effect" in that it will relieve the majority of entities in the group from submitting data in part 2 of the application. NRDC cites *NRDC v. EPA*, 683 F.2d 752 (3rd Cir.1982) and *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C.Cir.1981) in support of its argument. Both cases involved the postponement of regulations. *See NRDC*, 683 F.2d at 753–54, 764 (indefinite postponement of effective date of final amendments to regulations dealing with the discharge of toxic pollutants requires notice and comment because it has a substantial impact on the public and the industry); *Council of Southern Mountains, Inc.*, 653 F.2d at 575, 580 n. 28 (deferral of implementation of regulations requiring coal operators to supply life-saving equipment ordinarily would require notice and comment because it has a "palpable effect" upon the industry and the public).

We find these cases to be distinguishable. Both involve the postponement of rules of general applicability to an entire industry, or to a large class of pollutants. In contrast, although the part 1 application process will relieve some entities from the

need to furnish further data, the decision is specific to a particular permit application and approval of a preliminary application will not implement, interpret or prescribe any general law or policy pursuant to 5 U.S.C. § 551(4). Rulemaking ordinarily involves "broad judgments, legislative in nature rather than the resolution of a particular dispute of facts." *Washington Utilities & Transportation Com'n v. Federal Communication Commission*, 513 F.2d 1142, 1160 (9th Cir.1975), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). The decision to approve a part 1 permit application, although it may affect a large number of applicants, is nevertheless focused on a specific factual question: whether the application adequately designates a representative smaller group subject to the more extensive data gathering requirements in part 2 of the application. *See* 55 Fed.Reg. at 48,028. Because the decision involves a discrete, factual issue, the better view is that it is neither a rule nor otherwise subject to the notice and comment requirement.

Because approval of a part 1 application is essentially a factual determination, we hold that EPA's group permit application process for industrial dischargers is not invalid by its failure to provide for notice and comment.

### III. CONCLUSION

In summary, we grant and deny relief as follows:

1. *"Deadlines" issue.* We grant the request for declaratory relief and deny the request for injunctive relief. We deny the request to place small, medium and large municipalities on the same permitting schedule. We hold that EPA's failure to include deadlines for permit approval or denial and compliance consistent with CWA § 402(p) is arbitrary and capricious.

2. *Exclusion of Sources from Regulation.* We uphold the definition of "munici-

---

submit quantitative data in part 2 of the application. 55 Fed.Reg. at 48,067.

**20.** A rule means "the whole or part of an agency statement of general or particular applicability

and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. § 551(4).

pal separate storm sewers serving a population." We hold that the exemption for construction sites of less than five acres is arbitrary and capricious and remand for further proceedings. Based on the record before us, we vacate that portion of the rule regulating "light industry" and remand for further proceedings.

3. *Other issues.* We uphold the rule as to oil and gas operations and storm water control. We further hold that EPA approval of part 1 of a group application for an industrial discharger is not a rule requiring notice and comment from the public.

Petition for Review GRANTED IN PART and DENIED IN PART.

## APPENDIX A

### CWA § 402, 33 USCA § 1342

**(*l*) Limitation on permit requirement**

. . . .

#### (2) Stormwater runoff from oil, gas, and mining operations

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

. . . .

**(p) Municipal and industrial stormwater discharges**

#### (1) General rule

Prior to October 1, 1992, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

#### (2) Exceptions

Paragraph (1) shall not apply with respect to the following stormwater discharges:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000 .

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

#### (3) Permit requirements

#### (A) Industrial discharges

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

#### (B) Municipal discharge

Permits for discharges from municipal storm sewers—

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or

the State determines appropriate for the control of such pollutants.

## (4) Permit application requirements

### (A) Industrial and large municipal discharges

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

### (B) Other municipal discharges

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

## (5) Studies

The Administrator, in consultation with the States, shall conduct a study for the purposes of—

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

(C) establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

## (6) Regulations

Not later than October 1, 1992, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I, II.A, II.C.1, II.C.4, II.E, and much of Part II.B of the majority opinion. I dissent from Part II.B.2.c, directing EPA to issue supplemental regulations. I dissent also from Parts II.C.2 and II.C.3, in which the court invalidates EPA's exclusion of storm water discharges from certain light industrial and small construction sites from the definition of "discharges associated with industrial activity." Finally, I concur in the result, but not the reasoning, of Part II.D, holding that EPA has not acted unlawfully by failing to include specific control requirements in the permit application regulations.

I

The majority holds that EPA has violated statutory requirements by failing to set dates for approval of, and compliance with, permits as part of its permit application program. *Ante* at 1300. Despite the holding in Part II.B.2.b that injunctive relief is inappropriate (with which I agree), the majority in Part II.B.2.c orders EPA to issue supplemental regulations setting such deadlines immediately.

I am not convinced that the statute requires EPA to set these deadlines as part of the permit application process. The provision at issue reads, in relevant part:

(4) Permit application requirements

(A) Industrial and large municipal discharges

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(B) Other municipal discharges

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

CWA § 402(p)(4); 33 U.S.C. § 1342(p)(4) (1988).

While the statute establishes a time line EPA must follow, it does not, in my view, require that EPA include the deadline for permit approval in the permit application regulations. I agree that, given EPA's past delays and the fact that the statutory dates for issuance or denial of permits are now long past, it is appropriate for this court to declare that the statute requires EPA to issue or deny permits within one year of the application deadline. I do not, however, see that any purpose is served by requiring EPA to issue supplemental regulations setting out these deadlines, and I doubt our authority to do so.

With respect to compliance deadlines, the statute contemplates that such deadlines will be set in individual permits as they are issued. *See* CWA § 402(p)(4)(A), (B) ("Any such permit shall provide for compliance...."). Each permit must contain a compliance deadline, which may not exceed three years from the date of issuance. Nothing in the statute requires EPA to establish compliance deadlines now, before any permits have been issued. Accordingly, in my view, NRDC's challenge to the lack of compliance deadlines in EPA's current regulations is premature. I therefore dissent from Part II.B.2.c of the majority opinion.

II

I dissent also from Parts II.C.2 and II.C.3. In my view, EPA's definition of "discharge associated with industrial activity" is a reasonable construction of an ambiguous statute, entitled to deference. While my colleagues acknowledge that we may not overturn an agency rule that represents a "permissible construction" of a statute, *ante* at 1297 (quoting *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)), they fail to apply that axiom.

A

EPA's rule excludes from the permitting requirement certain light industry facilities at which "areas where material handling equipment or activities, raw materials, in-

termediate products, final products, waste materials, byproducts, or industrial machinery" are not exposed to storm water. *See* 40 C.F.R. § 122.26(b)(14). EPA determined that discharges from such facilities do not fall within the definition of "discharges associated with industrial activity." In my view, this determination was reasonable.

The majority concedes that the statute does not define "discharge associated with industrial activity." *Ante* at 1304. The operative phrase, as my colleagues note, is "associated with." *See id.* For purposes of evaluating the light industry exemption, I concede that manufacturing falls within the generally accepted meaning of "industrial activity," and that many of the facilities exempted by the EPA rule are manufacturers. Nonetheless, that concession does not compel the conclusion that discharges from such facilities are "associated with industrial activity."

The majority concludes, without explanation, that the phrase "discharges associated with industrial activity" is "very broad." *Ante* at 1304. Neither the plain meaning of the term "associated" nor the legislative history of the statute support this conclusion. "Associated with" means closely related to or connected with. *See Webster's Ninth New Collegiate Dictionary* 110 (1986). To the extent it casts any light on the subject, the legislative history supports a narrow reading of the phrase "associated with." Four members of the House, in the course of floor debates on the measure both before and after President Reagan's veto, explained that:

> [a] discharge is associated with industrial activity if it is *directly related to manufacturing, processing or raw materials storage areas* at an industrial plant. Discharges which do not meet this definition include those discharges associated with parking lots and administrative and employee buildings.

133 Cong.Rec. 985 (1987) (statement of Rep. Hammerschmidt) (emphasis added).[1] The underscored language suggests that Congress intended to regulate only discharges directly related to certain activities at industrial facilities. EPA's interpretation, that discharges are "directly related" to these activities only if storm water may reasonably be expected to come into contact with them before its discharge, is eminently logical.

The majority opinion interprets the exclusion of parking lots as an expression of congressional intent "to exclude only those facilities or parts of a facility that are completely nonindustrial." *Ante* at 1304. My colleagues' reliance on the second sentence of the statement quoted above to establish this intent, however, is misplaced. The sentence relied on cannot assist us in our search for the meaning of "associated with" because it employs that very term. Moreover, it does not pretend to establish an exhaustive list of areas excluded from regulation. Legislators listed discharges from parking lots and administrative and employee buildings as *among those* not directly related to industrial activity; no one suggested that *only* discharges associated with those structures were to be excluded.

EPA's definition is consistent with the plain words of the statute and, to the extent any intent is discernible, the congressional intent. EPA has defined the term "storm water discharge associated with industrial activity" to cover only those discharges reasonably expected to come into contact with industrial activities. A large number of facilities automatically fall within EPA's definition and are required to

---

1. This statement was repeated verbatim by Reps. Stangeland and Snyder. 133 Cong. Rec. at 991–92; 132 Cong. Rec. at 31,959, 31,964 (1986). Rep. Rowland offered a slight variation on the theme:

> One of the discharge categories is "a discharge associated with an industrial activity." A discharge is not considered to be associated with industrial activity unless it is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant. Such discharges include [sic] those from parking lots and administrative areas and employee buildings.

132 Cong. Rec. at 31,968. Rep. Rowland apparently misspoke; he probably meant, like the other legislators who addressed the topic, to say "[s]uch discharges *do not* include" those from parking lots.

apply for permits. Because facilities falling within certain specified classifications under the Standard Industrial Classification manual generally conduct their operations entirely indoors, minimizing the likelihood of contact with storm water, EPA has not automatically included them within the regulations. However, these facilities *are* required to apply for permits if "areas where material handling equipment or activities, raw materials, intermediate products, final products, waste materials, byproducts, or industrial machinery at these facilities are exposed to storm water." 40 C.F.R. § 122.26(b)(14). If a storm water discharge is in fact directly related to or associated with the industrial activity carried on at a facility falling within the light industry category, the facility must obtain a permit.[2]

In my view, the statute's treatment of oil and gas facilities supports EPA's reading of the term "associated with industrial activity." Congress specifically exempted from the permit requirement discharges from oil and gas facilities and mining operations which have not come in contact with raw materials, finished products, or waste products. CWA § 402(*l*)(2). This section indicates a congressional intent to exempt uncontaminated discharges which have not come into contact with "industrial activities" from regulation. For oil, gas, and mining operations, Congress in this section supplied a specific, and quite limited, definition of "industrial activities." For other facilities, that definition was left to the discretion of EPA, which has adopted a much broader definition, encompassing contact with such things as industrial machin-

ery and materials handling equipment. *See* 40 C.F.R. § 122.26(b)(14).

I do not mean to suggest that the majority's construction of the statute is untenable. It may even be preferable to the reading chosen by the agency. Nonetheless, in my view the statute is ambiguous and the legislative history does not demonstrate any clear congressional intent. The question before this court, therefore, is not whether "the agency construction was the only one it permissibly could have adopted" or even whether it is the "reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron, U.S.A. v. NRDC,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984). We need only inquire if the agency's construction is a permissible one. *Id.* at 843, 104 S.Ct. at 2781. EPA's definition falls well within permissible bounds, and should be upheld.

### B

Although the issue is closer, I also am not persuaded that EPA's exemption for construction sites under five acres should be struck down. EPA has not conceded that "construction activity is industrial in nature." *Ante* at 1306. In the preamble to its final rule, EPA noted that "Construction activity *at a high level of intensity is comparable to other activity that is traditionally viewed as industrial,* such as natural resource extraction."[3] 55 Fed.Reg. 48,033 (1990) (emphasis added). EPA explained that it was "attempting to focus [regulation] only on those construction ac-

---

**2.** Thus, nothing turns on the assumption, attacked by my colleagues as unsupported by the record, *ante* at 1304, that industrial activities at this category of facilities will take place largely indoors. Where the assumption does not hold true, the permit requirement applies with full force. I also note that NRDC has pointed us to no evidence undermining EPA's assumption.

Unlike my colleagues, I decline to assume that EPA will not carry out its responsibility to identify and to require permits of facilities where industrial activities are in fact exposed to storm water, or that such facilities will ignore their statutory duty to apply for permits. Should that

occur, a lawsuit challenging EPA's failure to enforce its regulations might well be in order. An unsubstantiated suspicion that EPA may not vigorously enforce its regulations, however, does not make those regulations arbitrary or capricious.

**3.** EPA did admit that "[e]ven small construction sites may have a significant negative impact on water quality in localized areas," 55 Fed.Reg. at 48,033. In the absence of any indication of what EPA meant by "small," however, that statement does not undermine EPA's exemption of sites under five acres.

tivities that *resemble* industrial activity." 55 Fed.Reg. at 48,035 (emphasis added).

Neither NRDC nor the majority point to anything in the statute or the legislative history that would require the agency to define "industrial activity" as including all construction operations. Accordingly, I believe deference is due EPA's definition, provided it is not arbitrary, capricious, or manifestly contrary to the statute. *Chevron, U.S.A.,* 467 U.S. at 844, 104 S.Ct. at 2782.

In trying to determine when construction should be treated as industrial activity, EPA considered a number of possible approaches. *See* 55 Fed.Reg. at 48,035. Exempting construction that would be completed within a certain designated time frame was deemed inappropriate, because the work could be both intensive and expansive but nonetheless take place over a short period of time. Basing the limit on quantity of soil removed was also rejected as not relating to the amount of land surface disturbed. EPA finally settled on the surface area disturbed by the construction project as a feasible and appropriate mechanism for "identifying sites that are [sic] amount to industrial activity." 55 Fed. Reg. at 48,036.

Having determined that not all construction amounts to industrial activity, and that the appropriate basis for differentiation is land area disturbed, EPA then had to determine where to draw the line. Initially, EPA proposed to exempt all construction operations disturbing less than one acre of land, as well as single family residential projects disturbing less than five acres. 53 Fed.Reg. 49,431 (1988). In the final rule, however, EPA adopted a five-acre minimum for all construction projects. 55 Fed. Reg. 48,066 (1990); 40 C.F.R. § 122.-26(b)(14)(x).

Admittedly, the final rule contains little in the way of justification for treating two-acre sites differently than five-acre ones, but that does not necessarily make it arbitrary and capricious. Line-drawing is often difficult. NRDC was apparently willing to accept EPA's proposed one-acre/five-acre rule. Although NRDC now challenges the blanket five-acre rule, it offers no evidence that sites excluded from the permitting requirement constitute "industrial activity." In such absence of any evidence in the record undermining EPA's conclusion on an issue squarely within its expertise, I believe the rule must be upheld.[4]

### III

Finally, while I concur in the result reached by the majority in Part II.D, rejecting NRDC's claim that EPA has unlawfully failed to require substantive controls on municipal discharges, I disagree with the majority's reasoning. In my view, NRDC's claim is premature, and we should decline to address its merits.

NRDC contends that the 1987 amendments require EPA to establish substantive controls for municipal storm water discharges. In support of this argument, NRDC relies on CWA § 402(p)(3)(B), 33 U.S.C. § 1342(p)(3)(B), which provides:

> Permits for discharges from municipal storm sewers—
>
> \* \* \* \* \* \*
>
> (ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and
>
> (iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable....

This section refers only to *permits,* and says nothing about permit applications. Because EPA has yet to issue any permits, NRDC's claim on this point is premature. In the absence of any indication to the contrary, we must assume that any permit issued will comply with all applicable statutory requirements. The statute does not require that EPA detail the substantive controls to be imposed when establishing permit application requirements. Accordingly, I would reject NRDC's claim without

---

**4.** Because I conclude that the rule falls within the permissible bounds of the statutory definition of "discharges associated with industrial activity," I need not consider the applicability of the *de minimis* exception.

reaching the issue of the Administrator's discretion in selecting those controls.

## IV

In sum, I join much of my colleagues' opinion. However, I would not require EPA to issue supplemental regulations detailing the time line for issuance of and compliance with permits, and I would uphold EPA's definition of "discharge associated with industrial activity." Finally, I would reject NRDC's claim that EPA is required to detail control measures in the permit application regulations on the grounds that the statute requires control measures only in the permits themselves.