(Slip Opinion)     OCTOBER  TERM,  2012                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DECKER, OREGON STATE FORESTER, ET AL. *v.* NORTHWEST ENVIRONMENTAL DEFENSE CENTER

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–338.  Argued December 3, 2012—Decided March 20, 2013*

The Clean Water Act (Act) requires that National Pollutant Discharge Elimination System (NPDES) permits be secured before pollutants are discharged from any point source into the navigable waters of the United States.  See 33 U. S. C. §§1311(a), 1362(12).  One of the Environmental Protection Agency's (EPA) implementing regulations, the Silvicultural Rule, specifies which types of logging-related discharges are point sources.  40 CFR §122.27(b)(1).  These discharges require NPDES permits unless some other federal statutory provision exempts them from coverage.  One such statutory provision exempts "discharges composed entirely of stormwater," 33 U. S. C. §1342(p)(1), unless the discharge is "associated with industrial activity," §1342(p)(2)(B).  Under the EPA's Industrial Stormwater Rule, the term "associated with industrial activity" covers only discharges "from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant."  40 CFR §122.26(b)(14).  Shortly before oral argument in the instant cases, the EPA issued a final version of an amendment to the Industrial Stormwater Rule, clarifying that the NPDES permit requirement applies only to logging operations involving rock crushing, gravel washing, log sorting, and log storage facilities, which are all listed in the Silvicultural Rule.

Petitioner Georgia-Pacific West has a contract with Oregon to har-

————————

*Together with No. 11–347, *Georgia-Pacific West, Inc., et al.* v. *Northwest Environmental Defense Center,* also on certiorari to the same court.

vest timber from a state forest. When it rains, water runs off two logging roads used by petitioner into ditches, culverts, and channels that discharge the water into nearby rivers and streams. The discharges often contain large amounts of sediment, which evidence shows may be harmful to fish and other aquatic organisms. Respondent Northwest Environmental Defense Center (NEDC) filed suit against petitioner and state and local governments and officials, including petitioner Decker, invoking the Act's citizen-suit provision, 33 U. S. C. §1365, and alleging that the defendants had not obtained NPDES permits before discharging stormwater runoff into two Oregon rivers. The District Court dismissed the action for failure to state a claim, concluding that NPDES permits were not required because the ditches, culverts, and channels were not point sources of pollution under the Act and the Silvicultural Rule. The Ninth Circuit reversed. It held that the conveyances were point sources under the Silvicultural Rule. It also concluded that the discharges were "associated with industrial activity" under the Industrial Stormwater Rule, despite the EPA's contrary conclusion that the regulation excludes the type of stormwater discharges from logging roads at issue. Thus, the court held, the discharges were not exempt from the NPDES permitting scheme.

*Held*:

   1. A provision of the Act governing challenges to agency actions, §1369(b), is not a jurisdictional bar to this suit. That provision is the exclusive vehicle for suits seeking to invalidate certain agency decisions, such as the establishment of effluent standards and the issuance of permits. It does not bar a district court from entertaining a citizen suit under §1365 when the suit is against an alleged violator and seeks to enforce an obligation imposed by the Act or its regulations. The present action falls within the scope of §1365. Pp. 8–9.

   2. The EPA's recent amendment to the Industrial Stormwater Rule does not make the cases moot. A live controversy continues to exist regarding whether petitioners may be held liable for unlawful discharges under the earlier version of the Industrial Stormwater Rule. That version governed petitioners' past discharges, which might be the basis for the imposition of penalties even if, in the future, those types of discharges will not require a permit. These cases thus remain live and justiciable. See *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 64–65. The fact that the District Court might rule that NEDC's arguments lack merit, or that relief is not warranted on the facts of these cases, does not make the cases moot. Pp. 9–11.

   3. The preamendment version of the Industrial Stormwater Rule, as permissibly construed by the EPA, exempts discharges of chan-

neled stormwater runoff from logging roads from the NPDES permit-
ting scheme. The regulation is a reasonable interpretation of the
statutory term "associated with industrial activity," §1342(p)(2)(B),
and the agency has construed the regulation to exempt the discharges
at issue here. When an agency interprets its own regulation, the
Court, as a general rule, defers to it "unless that interpretation is
'plainly erroneous or inconsistent with the regulation.'" *Chase Bank
USA, N. A.* v. *McCoy*, 562 U. S. ___, ___ (quoting *Auer* v. *Robbins*, 519
U. S. 452, 461). Here, it was reasonable for the EPA to conclude that
the conveyances at issue are "directly related" only to the harvesting
of raw materials, rather than to "manufacturing, processing, or raw
materials storage areas at an industrial plant." 40 CFR
§122.26(b)(14). The regulatory scheme, taken as a whole, leaves open
the rational interpretation that the regulation extends only to tradi-
tional industrial buildings such as factories and associated sites and
other relatively fixed facilities.

Another reason to accord *Auer* deference to the EPA's interpreta-
tion is that there is no indication that the agency's current view is a
change from prior practice or is a *post hoc* justification adopted in re-
sponse to litigation. See *Christopher* v. *SmithKline Beecham Corp.*,
567 U. S. ___, ___. Rather, the EPA has been consistent in its view
that the types of discharges at issue do not require NPDES permits.
Its decision also exists against a background of state regulation with
respect to stormwater runoff from logging roads. In exercising the
broad discretion the Act gives the EPA in the realm of stormwater
runoff, the agency could reasonably have concluded that further fed-
eral regulation would be duplicative or counterproductive in light of
Oregon's extensive rules on the subject. Pp. 11–15.

640 F. 3d 1063, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and THOMAS, GINSBURG, ALITO, SOTOMAYOR, and KAGAN, JJ.,
joined, and in which SCALIA, J., joined as to Parts I and II. ROBERTS,
C. J., filed a concurring opinion, in which ALITO, J., joined. SCALIA, J.,
filed an opinion concurring in part and dissenting in part. BREYER, J.,
took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 11–338 and 11–347

DOUG DECKER, IN HIS OFFICIAL CAPACITY AS OREGON STATE FORESTER, ET AL., PETITIONERS
11–338            *v.*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER

GEORGIA-PACIFIC WEST, INC., ET AL., PETITIONERS
11–347            *v.*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 20, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

These cases present the question whether the Clean Water Act (Act) and its implementing regulations require permits before channeled stormwater runoff from logging roads can be discharged into the navigable waters of the United States. Under the statute and its implementing regulations, a permit is required if the discharges are deemed to be "associated with industrial activity." 33 U. S. C. §1342(p)(2)(B). The Environmental Protection Agency (EPA), with the responsibility to enforce the Act, has issued a regulation defining the term "associated with industrial activity" to cover only discharges "from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial

plant." 40 CFR 122.26(b)(14) (2006). The EPA interprets its regulation to exclude the type of stormwater discharges from logging roads at issue here. See Brief for United States as *Amicus Curiae* 24–27. For reasons now to be explained, the Court concludes the EPA's determination is a reasonable interpretation of its own regulation; and, in consequence, deference is accorded to the interpretation under *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997).

## I

## A

Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U. S. C. §1251(a). A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States. See §§1311(a), 1362(12); *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 205 (1976). The Act defines "point source" as

> "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture." §1362(14).

When the Act took effect, the EPA found it difficult to process permit applications from countless owners and operators of point sources throughout the country. The agency issued regulations exempting certain types of point-source discharges from the NPDES permitting

scheme, but in 1977 those directives were found invalid. The Court of Appeals for the District of Columbia Circuit ruled that the statute did not give the EPA "authority to exempt categories of point sources from the permit requirements" of the Act. *Natural Resources Defense Council, Inc.* v. *Costle*, 568 F. 2d 1369, 1377. In response the EPA issued new regulations to define with more precision which categories of discharges qualified as point sources in the first place. Among these regulations was the so-called Silvicultural Rule. This rule is at issue here. It provides:

> "*Silvicultural point source* means any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. The term does not include non-point source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance from which there is natural runoff." 40 CFR §122.27(b)(1).

Under the quoted rule, any discharge from a logging-related source that qualifies as a point source requires an NPDES permit unless some other federal statutory provision exempts it from that coverage. In one such provision, 33 U. S. C. §1342(p), Congress has exempted certain discharges of stormwater runoff. The statutory exemptions were considered necessary because, from the outset, the EPA had encountered recurring difficulties in determining how best to manage discharges of this kind. See, *e.g., Natural Resources Defense Council, Inc.* v. *EPA*, 966 F. 2d 1292, 1295–1296 (CA9 1992). In 1987, Congress responded to these problems and adopted various stormwater-related

amendments to the Act.  §405, 101 Stat. 69, 33 U. S. C.
§1342(p).

The 1987 amendments exempt from the NPDES permitting scheme most "discharges composed entirely of stormwater."  §1342(p)(1).  The general exemption, however, does
not extend to all stormwater discharges.  As relevant here,
Congress directed the EPA to continue to require permits for stormwater discharges "associated with industrial activity."  §1342(p)(2)(B).  The statute does not define
that term, but the EPA adopted a regulation (hereinafter
Industrial Stormwater Rule) in which it defined it as

> "the discharge from any conveyance that is used for
> collecting and conveying storm water and that is
> directly related to manufacturing, processing or raw
> materials storage areas at an industrial plant.  The
> term does not include discharges from facilities or ac
> tivities excluded from the NPDES program under this
> part 122.  For the categories of industries identified
> in this section, the term includes, but is not limited
> to, storm water discharges from . . . immediate access
> roads and rail lines used or traveled by carriers of raw
> materials, manufactured products, waste material, or
> by-products used or created by the facility . . . ."  40
> CFR §122.26(b)(14) (2006).

The Industrial Stormwater Rule also specified that, with
one exception not relevant here, "[f]acilities classified
as Standard Industrial Classificatio[n] 24" are "considered
to be engaging in 'industrial activity' for purposes of paragraph (b)(14)."  *Ibid.*  The Standard Industrial Classifications are a system used by federal agencies to categorize
firms engaged in different types of business activity.  See
Dept. of Labor, Standard Industrial Classifications Manual,
online at http://www.osha.gov/pls/imis/sic_manual.html (as
visited Mar. 14, 2013, and available in Clerk of Court's
case file).  Standard Industrial Classification 24 identifies

industries involved in the field of "Lumber and Wood Products." 2 App. 64. This includes the "Logging" industry, defined as "[e]stablishments primarily engaged in cutting timber and in producing . . . primary forest or wood raw materials." *Ibid.*

On November 30, 2012—three days before the instant cases were argued in this Court—the EPA issued its final version of an amendment to the Industrial Stormwater Rule. The amendment was the agency's response to the Court of Appeals' ruling now under review. The amended version seeks to clarify the types of facilities within Standard Industrial Classification 24 that are deemed to be engaged in industrial activity for purposes of the rule. The amended Industrial Stormwater Rule does not cover all facilities within Standard Industrial Classification 24. It limits covered stormwater discharges to

> "[f]acilities classified within Standard Industrial Classification 24, Industry Group 241 that are rock crushing, gravel washing, log sorting, or log storage facilities operated in connection with silvicultural activities . . . and Industry Groups 242 through 249." 77 Fed. Reg. 72974, pt. 122, subpt. B (2012).

It should be noted, by way of explanation, that an Industry Group is a subcategory of businesses within a Standard Industrial Classification. Industry Group 241 is "Logging," while Industry Groups 242 through 245 are, respectively, "Sawmills and Planing Mills," "Millwork, Veneer, Plywood, and Structural Wood," "Wood Containers," and "Wood Buildings and Mobile Homes." Industry Group 249 is "Miscellaneous Wood Products." Industry Groups 246 through 248 are blank categories. Standard Industrial Classifications Manual, *supra*, Major Group 24.

It is fair to say the purpose of the amended regulation is to bring within the NPDES permit process only those logging operations that involve the four types of activity

(rock crushing, gravel washing, log sorting, and log stor-
age facilities) that are defined as point sources by the
explicit terms of the Silvicultural Rule.

Up to this stage in the litigation, of course, the cases
have been concerned with the Industrial Stormwater Rule
before the amendment adopted on November 30, 2012.
The amended regulation will determine whether from this
point forward NPDES permits will be required for the
stormwater discharges at issue. The parties disagree
about the significance of the amended rule for purposes of
these cases. Before reaching this and other preliminary
points, however, it is appropriate to set forth the facts and
history of the cases leading to the proceedings in this
Court.

B

At issue are discharges of channeled stormwater runoff
from two logging roads in Oregon's Tillamook State For-
est, lying in the Pacific Coast Range about 40 miles west
of Portland. Petitioner Georgia-Pacific West, along with
other logging and paper-products companies, has a con-
tract with the State of Oregon to harvest timber from the
forest. It uses the roads for that purpose. When it rains
(which it does often in the mountains of northwest Oregon,
averaging in some areas more than 100 inches per year),
water runs off the graded roads into a system of ditches,
culverts, and channels that discharge the water into
nearby rivers and streams. The discharges often contain
large amounts of sediment, in the form of dirt and crushed
gravel from the roads. There is evidence that this runoff
can harm fish and other aquatic organisms.

In September 2006, respondent Northwest Environmen-
tal Defense Center (NEDC) filed suit in the United States
District Court for the District of Oregon. It invoked the
Clean Water Act's citizen-suit provision, 33 U. S. C. §1365,
and named as defendants certain firms involved in log-

ging and paper-products operations (including petitioner Georgia-Pacific West), as well as state and local governments and officials (including the State Forester of Oregon, who is now petitioner Doug Decker). The suit alleged that the defendants caused discharges of channeled stormwater runoff into two waterways—the South Fork Trask River and the Little South Fork Kilchis River. The defendants had not obtained NPDES permits, and so, the suit alleged, they had violated the Act.

The District Court dismissed the action for failure to state a claim. It concluded that NPDES permits were not required because the ditches, culverts, and channels were not point sources of pollution under the Act and the Silvicultural Rule. The Court of Appeals for the Ninth Circuit reversed. *Northwest Environmental Defense Center* v. *Brown*, 640 F. 3d 1063 (2011). It relied upon three principal propositions. First, it held that the District Court had subject-matter jurisdiction under §1365 notwithstanding a different provision of the Act, 33 U. S. C. §1369(b)(1), limiting judicial review of EPA regulations. Second, the Court of Appeals held that while the EPA's Silvicultural Rule is ambiguous on the question whether the conveyances at issue are point sources, those conveyances must be deemed point sources under the rule in order to give effect to the Act's expansive definition of the term. Third, the Court of Appeals held that because the Industrial Stormwater Rule makes cross-reference to Standard Industrial Classification 24, the discharges at issue are "associated with industrial activity" within the meaning of the regulation, despite the EPA's conclusion to the contrary. The regulation was held to be unambiguous on this point. The Court of Appeals thus ruled that the discharges were from point sources and not exempt from the NPDES permitting scheme by the Industrial Stormwater Rule. It followed that petitioners had been in violation of the Act.

This Court granted certiorari. 567 U. S. ___ (2012).

## II

Before proceeding to the merits, it is necessary to consider two jurisdictional questions.

## A

Respondent NEDC invoked the jurisdiction of the District Court under 33 U. S. C. §1365(a), which "authorize[s] private enforcement of the provisions of [the Clean Water Act]" and its implementing regulations. *Department of Energy* v. *Ohio*, 503 U. S. 607, 613, n. 5 (1992). Petitioners, however, maintain that this suit is barred by a separate provision of the Act, §1369(b). That statute provides for "judicial review in the United States courts of appeals of various particular actions by the [EPA] Administrator, including establishment of effluent standards and issuance of permits for discharge of pollutants." *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13–14 (1981). Where that review is available, it is the exclusive means of challenging actions covered by the statute, §1369(b)(2), and an application for review must be lodged in the court of appeals within 120 days of the Administrator's action, §1369(b)(1).

The Court of Appeals was correct to rule that the exclusive jurisdiction mandate is not applicable in this suit. Section 1369(b) extends only to certain suits challenging some agency actions. It does not bar a district court from entertaining a citizen suit under §1365 when the suit is against an alleged violator and seeks to enforce an obligation imposed by the Act or its regulations.

The present action is within the scope of §1365. It is a claim to enforce what is at least a permissible reading of the Silvicultural Rule. The rule is ambiguous: Its characterization of silvicultural harvesting operations "from which there is natural runoff," 40 CFR §122.27(b)(1), as a

nonpoint source might be read, as petitioners contend, to apply to the channeled stormwater runoff at issue; or it might be read, as respondent NEDC urges, to apply only to runoff not collected in channels or other engineered improvements. See New Oxford American Dictionary 1167 (3d ed. 2010) (Oxford Dict.) ("natural" means "existing in or caused by nature; not made or caused by human-kind"). NEDC's reading would make the channeled discharges here point-source pollution under the Act. In its view only this interpretation can be squared with the Act's broad definition of "point source." 33 U. S. C. §1362(14). On this premise, the instant suit is an effort not to challenge the Silvicultural Rule but to enforce it under a proper interpretation. It is a basic tenet that "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States* v. *Larionoff*, 431 U. S. 864, 873 (1977).

For jurisdictional purposes, it is unnecessary to determine whether NEDC is correct in arguing that only its reading of the Silvicultural Rule is permitted under the Act. It suffices to note that NEDC urges the Court to adopt a "purposeful but permissible reading of the regulation . . . to bring it into harmony with . . . the statute." *Environmental Defense* v. *Duke Energy Corp.*, 549 U. S. 561, 573 (2007). NEDC does not seek "an implicit declaration that the . . . regulations were invalid as written." *Ibid.* And, as a result, §1369(b) is not a jurisdictional bar to this suit.

B

"It is a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed." *United States* v. *Juvenile Male*, 564 U. S. \_\_\_, \_\_\_ (2011) (*per curiam*) (slip op., at 4) (internal quotation marks omitted). This principle requires us to determine whether

the EPA's recent amendment to the Industrial Stormwater Rule makes the cases moot. In a supplemental brief filed after oral argument, petitioner Decker, joined by the United States as *amicus curiae*, takes the position that the recent amendment makes these cases moot in relevant part. See Supp. Brief for Petitioners in No. 11–338, pp. 4–6; Supp. Brief for United States as *Amicus Curiae* 4–8.

That conclusion is incorrect. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox* v. *Service Employees Int'l,* 567 U. S. ___, ___ (2012) (slip op., at 7) (internal quotation marks omitted). Here, despite the recent amendment, a live controversy continues to exist regarding whether petitioners may be held liable for unlawful discharges under the earlier version of the Industrial Stormwater Rule.

Respondent NEDC continues to press its claim that petitioners' discharges are unlawful under both the amended regulation and the earlier version. See Supp. Brief for Respondent 3–13. The instant cases provide no occasion to interpret the amended regulation. "'[W]e are a court of review, not of first view.'" *Arkansas Game and Fish Comm'n* v. *United States*, *ante*, at 13 (quoting *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005)). The parties, however, have litigated the suit extensively based on the earlier version of the Industrial Stormwater Rule; and that version governed petitioners' past discharges, which might be the basis for the imposition of penalties even if, in the future, those types of discharges will not require a permit.

If the Court of Appeals is correct that petitioners were obligated to secure NPDES permits before discharging channeled stormwater runoff, the District Court might order some remedy for their past violations. The Act contemplates civil penalties of up to $25,000 per day, 33 U. S. C. §1319(d), as well as attorney's fees for prevailing

parties, §1365(d). NEDC, in addition, requests injunctive relief for both past and ongoing violations, in part in the form of an order that petitioners incur certain environmental-remediation costs to alleviate harms attributable to their past discharges. Under these circumstances, the cases remain live and justiciable, for the possibility of some remedy for a proven past violation is real and not remote. See *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 64–65 (1987). The District Court, it is true, might rule that NEDC's arguments lack merit, or that the relief it seeks is not warranted on the facts of these cases. That possibility, however, does not make the cases moot. "There may be jurisdiction and yet an absence of merits." *General Investment Co.* v. *New York Central R. Co.*, 271 U. S. 228, 230 (1926).

## III

The substantive question of the necessity for an NPDES permit under the earlier rule now must be addressed. Under the Act, petitioners were required to secure NPDES permits for the discharges of channeled stormwater runoff only if the discharges were "associated with industrial activity," 33 U. S. C. §1342(p)(2)(B), as that statutory term is defined in the preamendment version of the Industrial Stormwater Rule, 40 CFR §122.26(b)(14) (2006). Otherwise, the discharges fall within the Act's general exemption of "discharges composed entirely of stormwater" from the NPDES permitting scheme. 33 U. S. C. §1342(p)(1).

NEDC first contends that the statutory term "associated with industrial activity" unambiguously covers discharges of channeled stormwater runoff from logging roads. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). That view, however, overlooks the multiple definitions of the terms "industrial" and "industry." These words can refer to business activity in general, yet so too can they be limited to "eco-

nomic activity concerned with the processing of raw materials and manufacture of goods in factories." Oxford Dict. 887. The latter definition does not necessarily encompass outdoor timber harvesting. The statute does not foreclose more specific definition by the agency, since it provides no further detail as to its intended scope.

Somewhat more plausible is NEDC's claim that the preamendment version of the Industrial Stormwater Rule unambiguously required a permit for the discharges at issue. NEDC reasons that under the rule, "[f]or the categories of industries identified in this section," NPDES permits are required for, among other things, "storm water discharges from . . . immediate access roads . . . used or traveled by carriers of raw materials." 40 CFR §122.26(b)(14) (2006). Yet this raises the question whether logging is a "categor[y] of industr[y]" identified by the section. The regulation goes on to identify a list of "categories of facilities" that "are considered to be engaging in 'industrial activity' for purposes" of the Industrial Stormwater Rule. *Ibid.* In the earlier version of the regulation, this list included "[f]acilities classified as Standard Industrial Classificatio[n] 24," which encompasses "Logging." *Ibid.* See also *supra,* at 4–5. Hence, NEDC asserts, logging is among the categories of industries for which "storm water discharges from . . . immediate access roads . . . used or traveled by carriers of raw materials" required NPDES permits under the earlier version of the Industrial Stormwater Rule. §122.26(b)(14). NEDC further notes, in support of its reading of the regulation, that modern logging is a large-scale, highly mechanized enterprise, using sophisticated harvesting machines weighing up to 20 tons. See Brief for Respondent 4–5.

The EPA takes a different view. It concludes that the earlier regulation invoked Standard Industrial Classification 24 "'to regulate traditional *industrial* sources such as sawmills.'" Brief for United States as *Amicus Curiae*

24–25. It points to the regulation's reference to "facilities" and the classification's reference to "establishments," which suggest industrial sites more fixed and permanent than outdoor timber-harvesting operations. *Ibid.* See also 55 Fed. Reg. 47990, 48008 (1990). This reading is reinforced by the Industrial Stormwater Rule's definition of discharges associated with industrial activity as discharges "from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 CFR §122.26(b)(14) (2006). This language lends support to the EPA's claim that the regulation does not cover temporary, outdoor logging installations. It was reasonable for the agency to conclude that the conveyances at issue are "directly related" only to the harvesting of raw materials, rather than to "manufacturing," "processing," or "raw materials storage areas." See Oxford Dict. 1066 (manufacturing is "mak[ing] (something) on a large scale using machinery"); *id.,* at 1392 (processing is "perform[ing] a series of mechanical or chemical operations on (something) in order to change or preserve it"). In addition, even if logging as a general matter is a type of economic activity within the regulation's scope, a reasonable interpretation of the regulation could still require the discharges to be related in a direct way to operations "at an industrial plant" in order to be subject to NPDES permitting.

NEDC resists this conclusion, noting that elsewhere in the Industrial Stormwater Rule the EPA has required NPDES permits for stormwater discharges associated with other types of outdoor economic activity. See §122.26(b)(14)(iii) (mining); §122.26(b)(14)(v) (landfills receiving industrial waste); §122.26(b)(14)(x) (large construction sites). The EPA reasonably could conclude, however, that these types of activities tend to be more fixed and permanent than timber-harvesting operations

are and have a closer connection to traditional industrial
sites. In light of the language of the regulation just dis-
cussed, moreover, the inclusion of these types of economic
activity in the Industrial Stormwater Rule need not be
read to mandate that all stormwater discharges related to
these activities fall within the rule, just as the inclusion of
logging need not be read to extend to all discharges from
logging sites. The regulation's reach may be limited by
the requirement that the discharges be "directly related to
manufacturing, processing or raw materials storage areas
at an industrial plant." §122.26(b)(14).

It is well established that an agency's interpretation
need not be the only possible reading of a regulation—or
even the best one—to prevail. When an agency interprets
its own regulation, the Court, as a general rule, defers to it
"unless that interpretation is 'plainly erroneous or incon-
sistent with the regulation.'" *Chase Bank USA, N. A.* v.
*McCoy*, 562 U. S. ___, ___ (2011) (slip op., at 12) (quoting
*Auer*, 519 U. S., at 461). The EPA's interpretation is
a permissible one. Taken together, the regulation's ref-
erences to "facilities," "establishments," "manufacturing,"
"processing," and an "industrial plant" leave open the
rational interpretation that the regulation extends only to
traditional industrial buildings such as factories and
associated sites, as well as other relatively fixed facilities.

There is another reason to accord *Auer* deference to the
EPA's interpretation: there is no indication that its cur-
rent view is a change from prior practice or a *post hoc*
justification adopted in response to litigation. See *Chris-
topher* v. *SmithKline Beecham Corp.*, 567 U. S. ___, ___
(2012) (slip op., at 10). The opposite is the case. The
agency has been consistent in its view that the types of
discharges at issue here do not require NPDES permits.

The EPA's decision exists against a background of state
regulation with respect to stormwater runoff from logging
roads. The State of Oregon has made an extensive effort

to develop a comprehensive set of best practices to manage stormwater runoff from logging roads. These practices include rules mandating filtration of stormwater runoff before it enters rivers and streams, Ore. Admin. Rule 629–625–0330(4) (2012); requiring logging companies to construct roads using surfacing that minimizes the sediment in runoff, Rule 629–625–0700(2); and obligating firms to cease operations where such efforts fail to prevent visible increases in water turbidity, Rule 629–625–0700(3). Oregon has invested substantial time and money in establishing these practices. In addition, the development, siting, maintenance, and regulation of roads—and in particular of state forest roads—are areas in which Oregon has considerable expertise. In exercising the broad discretion the Clean Water Act gives the EPA in the realm of stormwater runoff, the agency could reasonably have concluded that further federal regulation in this area would be duplicative or counterproductive. Indeed, Congress has given express instructions to the EPA to work "in consultation with State and local officials" to alleviate stormwater pollution by developing the precise kind of best management practices Oregon has established here. 33 U. S. C. §1342(p)(6).

* * *

The preamendment version of the Industrial Stormwater Rule, as permissibly construed by the agency, exempts discharges of channeled stormwater runoff from logging roads from the NPDES permitting scheme. As a result, there is no need to reach petitioners' alternative argument that the conveyances in question are not "pipe[s], ditch[es], channel[s], tunnel[s], conduit[s]," or any other type of point source within the Act's definition of the term. §1362(14).

For the reasons stated, the judgment of the Court of Appeals is reversed, and the cases are remanded for pro-

ceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 11–338 and 11–347

———

DOUG DECKER, IN HIS OFFICIAL CAPACITY AS OREGON
STATE FORESTER, ET AL., PETITIONERS
11–338                        *v.*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER

GEORGIA-PACIFIC WEST, INC., ET AL., PETITIONERS
11–347                        *v.*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 20, 2013]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, concurring.

The opinion concurring in part and dissenting in part raises serious questions about the principle set forth in *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410 (1945), and *Auer* v. *Robbins*, 519 U. S. 452 (1997). It may be appropriate to reconsider that principle in an appropriate case. But this is not that case.

Respondent suggested reconsidering *Auer*, in one sentence in a footnote, with no argument. See Brief for Respondent 42, n. 12. Petitioners said don't do it, again in a footnote. See Reply Brief for Petitioners in No. 11–338, p. 4, n. 1; see also *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 223–224 (1997) (declining to decide question that received only "scant argumentation"). Out of 22 *amicus* briefs, only two—filed by dueling groups of law professors—addressed the issue on the merits. See Brief for Law Professors as *Amici Curiae* on the Propriety of

Administrative Deference in Support of Respondent; Brief for Law Professors as *Amici Curiae* in Support of Petitioners; see also *FTC* v. *Phoebe Putney Health System, Inc.*, 568 U. S. ___, ___, n. 4 (2013) (slip op., at 7, n. 4) (declining to consider argument raised only by *amicus*).

The issue is a basic one going to the heart of administrative law. Questions of *Seminole Rock* and *Auer* deference arise as a matter of course on a regular basis. The bar is now aware that there is some interest in reconsidering those cases, and has available to it a concise statement of the arguments on one side of the issue.

I would await a case in which the issue is properly raised and argued. The present cases should be decided as they have been briefed and argued, under existing precedent.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 11–338 and 11–347

———————

DOUG DECKER, IN HIS OFFICIAL CAPACITY AS OREGON
STATE FORESTER, ET AL., PETITIONERS
11–338                    *v.*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER


GEORGIA-PACIFIC WEST, INC., ET AL., PETITIONERS
11–347                    *v.*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 20, 2013]

JUSTICE SCALIA, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion; I agree that these cases are not moot and that the District Court had jurisdiction. I do not join Part III. The Court there gives effect to a reading of EPA's regulations that is not the most natural one, simply because EPA says that it believes the unnatural reading is right. It does this, moreover, even though the agency has vividly illustrated that it can write a rule saying precisely what it means—by doing *just that* while these cases were being briefed.

Enough is enough.

## I

For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." *Talk America, Inc.* v. *Michigan Bell Telephone Co.*, 564 U. S.

___, ___ (2011) (SCALIA, J., concurring) (slip op., at 1). This is generally called *Seminole Rock* or *Auer* deference. See *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410 (1945); *Auer* v. *Robbins*, 519 U. S. 452 (1997).

Two Terms ago, in my separate concurrence in *Talk America*, I expressed doubts about the validity of this practice. In that case, however, the agency's interpretation of the rule was also the fairest one, and no party had asked us to reconsider *Auer*. Today, however, the Court's deference to the agency makes the difference (note the Court's defensive insistence that the agency's interpretation need not be "the best one," *ante,* at 14). And respondent has asked us, if necessary, to "'reconsider *Auer.*'" I believe that it is time to do so. See Brief for Respondent 42, n. 12; see also Brief for Law Professors on the Propriety of Administrative Deference as *Amici Curiae*. This is especially true because the circumstances of these cases illustrate *Auer*'s flaws in a particularly vivid way.

The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Seminole Rock*, *supra*, at 414. But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation. Obviously, that is not enough, or there would be nothing for *Auer* to do. In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading—within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for *Auer* deference. The first case to apply it, *Seminole Rock*, offered no justification whatever—just the *ipse*

*dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." 325 U. S., at 414. Our later cases provide two principal explanations, neither of which has much to be said for it. See generally Stephenson & Pogoriler, *Seminole Rock'*s Domain, 79 Geo. Wash. L. Rev. 1449, 1454–1458 (2011). First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it. *E.g., Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144, 150–153 (1991). The implied premise of this argument—that what we are looking for is the agency's *intent* in adopting the rule—is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 419 (1899). Whether governing rules are made by the national legislature or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" See, *e.g., Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 512 (1994). That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations—unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule—to "say what the law is," *Marbury* v. *Madison*, 1 Cranch 137,

177 (1803). Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of regulations *that they themselves crafted.* To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. See *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 740–741 (1996). While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers—that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive

powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Montesquieu, Spirit of the Laws bk. XI, ch. 6, pp. 151–152 (O. Piest ed., T. Nugent transl. 1949). Congress cannot enlarge its *own* power through *Chevron*—whatever it leaves vague in the statute will be worked out *by someone else*. *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way—the competing political branch—is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its *own* rules—that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." *Thomas Jefferson Univ., supra*, at 525 (THOMAS, J., dissenting). Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." 1 W. Blackstone, Commentaries on the Laws of England 58 (1765). And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. The Federalist No. 81, pp. 543–544 (J. Cooke ed. 1961). *Auer* deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice

and comment procedures." Anthony, The Supreme Court
and the APA: Sometimes They Just Don't Get It, 10 Ad-
min. L. J. Am. U. 1, 11–12 (1996). *Auer* is not a logical
corollary to *Chevron* but a dangerous permission slip for
the arrogation of power. See *Talk America*, 564 U. S., at
___ (SCALIA, J., concurring) (slip op., at 2–3); Manning,
Constitutional Structure and Judicial Deference to Agency
Interpretations of Agency Rules, 96 Colum. L. Rev. 612
(1996).

It is true enough that *Auer* deference has the same
beneficial pragmatic effect as *Chevron* deference: The
country need not endure the uncertainty produced by
divergent views of numerous district courts and courts of
appeals as to what is the fairest reading of the regulation,
until a definitive answer is finally provided, years later, by
this Court. The agency's view can be relied upon, unless it
is, so to speak, beyond the pale. But the duration of the
uncertainty produced by a vague regulation need not be as
long as the uncertainty produced by a vague statute. For
as soon as an interpretation uncongenial to the agency is
pronounced by a district court, the agency can begin the
process of amending the regulation to make its meaning
entirely clear. The circumstances of this case demonstrate
the point. While these cases were being briefed before us,
EPA issued a rule designed to respond to the Court of
Appeals judgment we are reviewing. See 77 Fed. Reg.
72974 (2012) (to be codified in 40 CFR pt. 122, sub pt. B).
It did so (by the standards of such things) relatively
quickly: The decision below was handed down in May 2011,
and in December 2012 the EPA published an amended
rule setting forth in unmistakable terms the position it ar-
gues here. And there is another respect in which a lack of
*Chevron*-type deference has less severe pragmatic conse-
quences for rules than for statutes. In many cases, when
an agency believes that its rule permits conduct that the
text arguably forbids, it can simply exercise its discretion

not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

## II

I would therefore resolve these cases by using the familiar tools of textual interpretation to decide: Is what the petitioners did here proscribed by the fairest reading of the regulations? What they did was to channel stormwater runoff from logging roads without a permit. To decide whether that was permissible we must answer one, and possibly two, questions: First, was the stormwater discharged from a "point source"? If not, no permit was required. But if so, we face the second question: Were the stormwater discharges exempt from the permit requirement because they were not "associated with industrial activity"? The fairest reading of the statute and regulations is that these discharges were from point sources, and were associated with industrial activity.

## A

The Clean Water Act generally prohibits discharging pollution without a permit from what it calls a "point source." 33 U. S. C. §1311(a). A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit," and several other things. §1362(14). The stormwater here was discharged from logging roads through a series of pipes, ditches, and channels—all items expressly named in the definition.

EPA argues that the Silvicultural Rule, 40 CFR

§122.27(b)(1) (2006), *excludes* from the definition of "[s]ilvicultural point source" "harvesting operations . . . from which there is natural runoff." This is relevant, says the agency, because that rule specifies that only "[s]ilvicultural point sources, as defined in this section," are "point sources subject to the . . . permit program." §122.27(a). In EPA's view, the stormwater here is "natural runoff."

But are stormwater discharges "natural runoff" when they are channeled through manmade pipes and ditches, and carry with them manmade pollutants from manmade forest roads? It is not obvious that this is so—as the agency agrees. See Brief for United States as *Amicus Curiae* 19 (the rule's "reference to 'natural runoff' associated with logging roads neither clearly encompasses nor clearly excludes the sort of channeled runoff that is at issue in this case"). In my view, giving the term the agency's interpretation would contradict the statute's definition of "point source," which explicitly includes any "pipe, ditch, channel, tunnel, [and] conduit." Applying the interpretive presumption of validity—the canon that we are to "prefe[r] the meaning that preserves to the meaning that destroys," *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 439 (1935) (Cardozo, J., dissenting)—I would hold that the regulation's exclusion of "natural runoff" does not reach the situation here. The stormwater discharges came from point sources, because they flowed out of artificial "pipe[s]," "ditch[es]," and "channel[s]," 33 U. S. C. §1362(14), and were thus not "*natural* runoff" from a logging operation, 40 CFR §122.27(b)(1) (emphasis added).

B

Many point-source stormwater discharges are nonetheless exempt from the usual permitting requirement. See 33 U. S. C. §1342(p). This exemption, however, does not reach discharges "associated with industrial activity."

*Ibid.* EPA has enacted a rule defining what it means for stormwater discharges to be "associated with" industrial activity, and what activities count as "industrial." 40 CFR §122.26(b)(14).

The regulation sets out eleven "categories of industries"; as to those industries, discharges are "associated with industrial activity" if they come from sites used for "transportation" of "any raw material." *Ibid.* The forest roads at issue here are used to transport raw material (logs); the only question is whether logging is a "categor[y] of industr[y]" enumerated in the definition. It is: The second of the listed "categories of facilities" is "[f]acilities classified as Standard Industrial Classifications 24 (except 2434)." §122.26(b)(14)(ii). Opening one's hymnal to Standard Industrial Classification 24 ("Lumber and Wood Products, Except Furniture"), one finds that the first industry group listed, No. 2411, is "Logging"—defined as "[e]stablishments primarily engaged in cutting timber." 2 App. 64. (As if that were not clear enough, an illustrative product of this industry is helpfully listed: "Logs.") That, I would think, is that.

EPA disagrees, and the Court gives the agency's position *Auer* deference, but that reading is certainly not the most natural one. The Court relies heavily on the fact that the definition of "[s]torm water discharge associated with industrial activity" requires that the discharge be "directly related to manufacturing, processing or raw materials storage areas at an industrial plant," §122.26(b)(14). The crucial question this definition presents is whether the concluding phrase "at an industrial plant" limits only the last noun phrase ("raw materials storage areas") or also the two preceding nouns ("manufacturing" and "processing"). The canon of interpretation known as the rule of the last antecedent states that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately

follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003). If a statute provides that "it shall be unlawful to possess a grenade launcher, a fully-automatic weapon, or a shotgun with a barrel shorter than 12 inches," that does not mean that a grenade launcher with a barrel *longer* than 12 inches is legal. Application of the canon would mean that "at an industrial plant" modifies only "raw materials storage areas," and therefore that "manufacturing" and "processing" *anywhere*, including in the forest, would be "associated with industrial activity." (Standard Industrial Classification 24 categorizes logging as a manufacturing business, and these discharges are therefore "directly related to manufacturing.")

Like all canons of interpretation, the rule of the last antecedent can be overcome by textual indication of contrary meaning. But that does not exist here. To the contrary, the enumerated categories of industries to which the term "industrial activity" applies reinforce the proposition that "at an industrial plant" does not modify "manufacturing" or "processing." The term includes (in addition to logging) "active or inactive mining operations," §122.26(b)(14)(iii); "[l]andfills" and "open dumps," §122.26(b)(14)(v); "automobile junkyards," §122.26(b)(14)(vi); and "[c]onstruction activity including clearing, grading and excavation," §122.26(b)(14)(x). *Those* industries and activities (while related to manufacturing and processing) virtually never take place at anything like what one might describe as a "plant." The rule of the last antecedent is therefore confirmed as the correct guide to meaning here: "at an industrial plant" limits only "raw materials storage areas."

EPA also insists, Brief for United States as *Amicus Curiae* 24, that the regulation reaches only "'traditional'" sources of industrial stormwater, such as sawmills. But Standard Industrial Classification 24 *has* a specific subcategory (No. 242) that is "Sawmills and Planing Mills." 2

App. 64. The rule is not so limited, reaching by its terms "Standard Industrial Classificatio[n] 24 (except 2434)." §122.26(b)(14)(ii). The explicit carving-out of No. 2434 is telling: Why EPA chose to exclude "establishments primarily engaged in manufacturing wood kitchen cabinet and wood bathroom vanities" from the definition of industrial stormwater, I do not know—but the picayune nature of the exclusion gives lie to the idea that the rule's scope ought to be decided by a rough sense of its gestalt. If EPA had meant to reach only sawmills, it quite obviously knew how to do so.

Finally, the Court believes that Standard Industrial Classification 24's reference to "establishments" "suggest[s] industrial sites more fixed and permanent than outdoor timber-harvesting operations." *Ante,* at 13. Not so. The Standard Industrial Classification uses "establishments" throughout to refer to business entities in general; for example, Classification 2411 refers to "[e]stablishments primarily engaged in cutting timber," which includes "producing wood chips in the field." 2 App. 64. I cannot imagine what kind of "fixed and permanent" industrial site the Court and EPA imagine will be "producing wood chips in the field." And the Court's final point, *ante,* at 13—that the regulatory definition of "industrial activity" uses the word "facilities"—cuts the other way: EPA regulations define "facility" to include "any . . . 'point source.'" 40 CFR §122.2; see, *e.g.,* §122.26(b)(14)(iii) (referring to mines as "facilities").

The agency also assures us that its *intent* (Brief for United States as *Amicus Curiae* 25) was to reach a more limited subset of logging activities, an intent that it believes can essentially float free from the text of the relevant rule. In the end, this is the real meat of the matter: EPA states that it simply did not mean to require permits for the discharges at issue here. And the Court is willing to credit that intent, even given what I think has been

amply demonstrated to be a contrary text.

*      *      *

Because the fairest reading of the agency's rules pro-
scribes the conduct at issue in these cases, I would affirm
the judgment below.  It is time for us to presume (to coin a
phrase) that an agency says in a rule what it means, and
means in a rule what it says there.